Filed 7/24/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)          S208843
    v. )
)     Ct.App. 2/4 B231038
JEFFREY ALLEN WHITMER, )
)     Los Angeles County
    Defendant and Appellant. )   Super. Ct. No. GA079423
_____ )

       Defendant, the manager of a motorcycle dealership, arranged for the fraudulent sales of vehicles to fictitious buyers.  A jury convicted him of 20 counts of grand theft for 20 separate fraudulent sales.  We must decide whether defendant was properly convicted of a separate theft for each vehicle fraudulently sold, or whether he could be convicted of only one count of grand theft because all of the sales were part of a single scheme.  Resolution of the issue requires us to revisit language in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*) that some Courts of Appeal have interpreted as permitting only one conviction of grand theft in circumstances like this.

       We conclude that past appellate courts have interpreted *Bailey* more broadly than is warranted.  We agree with the Court of Appeal in this case that a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching

scheme.  We disapprove of Court of Appeal decisions that are inconsistent with this conclusion.

However, we also conclude we cannot constitutionally apply this rule to defendant.  Under the law that has existed for decades, defendant could only have been convicted of a single count of grand theft.  We cannot apply the new rule retroactively to him.  Accordingly, and for this reason only, we reverse the judgment of the Court of Appeal, which had affirmed the judgment of conviction for the 20 counts of grand theft.

## I.  FACTS AND PROCEDURAL HISTORY

The Court of Appeal opinion, authored by Justice Manella, summarized the relevant facts:  "The prosecution submitted evidence that [defendant], while acting as manager for a motorcycle dealership, arranged for the fraudulent sale of 20 motorcycles, motorized dirt bikes, all-terrain vehicles (ATVs), and similar recreational vehicles.  In collaboration with Mordichi Mor, [defendant] arranged fraudulent sales to fictitious buyers, using falsified financing agreements and credit purchases, resulting in monetary losses to the dealership."  The Court of Appeal explained that each transaction resulting in a conviction "involved a different vehicle.  The 20 transactions occurred on 13 different dates.  With the exception of two dates, whenever more than one transaction occurred on a single date, the transactions involved distinct fictitious buyers.  On the two dates a fictitious buyer purportedly bought more than one vehicle, the transactions involved separate paperwork and documentation."  The value of the stolen vehicles ranged from $9,100 to over $20,000 per vehicle, resulting in a total loss to the dealership of over $250,000.

As relevant here, a jury convicted defendant of 20 counts of grand theft, one count for each of the vehicles fraudulently sold.  (Pen. Code, § 487.)  It also found true an enhancement allegation that defendant took, damaged, or destroyed

2

property valued at more than $200,000. (Pen. Code, former § 12022.6, subd. (a)(2).) The court sentenced defendant to prison for a total of 12 years.

Defendant appealed, arguing, among other contentions, that he could be convicted of one count of grand theft only. After analyzing our opinion in *Bailey*, *supra*, 55 Cal.2d 514, and reviewing the cases *Bailey* cited and later cases interpreting *Bailey*, the Court of Appeal concluded that defendant was properly convicted of one count of grand theft for each vehicle stolen. Recognizing that "other appellate courts have adopted a contrary interpretation of *Bailey*," it "urge[d]" this court "to revisit *Bailey*, as the guidance it offers regarding the aggregation of grand thefts is difficult to discern."

We granted defendant's petition for review and later limited review to the question of whether he was properly convicted of multiple counts of grand theft.

## II. DISCUSSION

The evidence shows that each count of grand theft was based on a separate and distinct act. Each transaction resulting in a stolen vehicle, even those transactions occurring on the same date, involved separate paperwork and documentation. We must decide whether defendant was properly convicted of one count of grand theft for each vehicle he stole, as the Court of Appeal found, or whether, as he argues, he can only be convicted of one count of grand theft. Central to this question is the proper interpretation of our opinion in *Bailey*, *supra*, 55 Cal.2d 514.

In *Bailey*, the defendant fraudulently told a welfare office that a man she had been living with had left her home. Later, and due to this misrepresentation, she received a series of welfare payments that she was not entitled to receive. She was convicted of one count of grand theft based on her receiving this series of welfare payments. (*Bailey*, *supra*, 55 Cal.2d at pp. 515-516.) Each payment, individually, would have constituted petty theft, but the payments totaled more

3

than $200, which at the time constituted grand theft. (*Id*. at p. 518 & fn. 3.) This court had to decide whether the defendant "was guilty of grand theft or of a series of petty thefts since it appears that she obtained a number of payments, each less than $200 but aggregating more than that sum." (*Id*. at p. 518.) The trial court had "instructed the jury that if several acts of taking are done pursuant to an initial design to obtain from the owner property having a value exceeding $200, and if the value of the property so taken does exceed $200, there is one crime of grand theft, but that if there is no such initial design, the taking of any property having a value not exceeding $200 is petty theft." (*Ibid*.)

We found the defendant was properly convicted of grand theft. "Several recent cases involving theft by false pretenses have held that where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft. [Citations.] The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents. The same rule has been followed in larceny and embezzlement cases, and it has been held that where a number of takings, each less than $200 but aggregating more than that sum, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft. [Citations.]" (*Bailey*, *supra*, 55 Cal.2d at p. 518-519.)

Particularly relevant to the issue presented here, the *Bailey* court added the following: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are *separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan*. [Citation.] In the following cases it was held that each receipt of property

4

obtained by false pretenses constituted a separate offense for which the defendant could be separately charged and convicted. [Citations.] Although none of these decisions discussed the rule set forth above, *it does not appear that the convictions would have been affirmed had the evidence established that there was only one intention, one general impulse, and one plan.*" (*Bailey*, *supra*, 55 Cal.2d at p. 519, italics added.)

Citing the language italicized in the previous paragraph from *Bailey*, *supra*, 55 Cal.2d at page 519, defendant argues there can only be one grand theft if multiple acts of grand theft are pursuant to a single intention, a single impulse, and a single plan. He further argues the thefts of this case come within this rule. As we explain below, the argument finds support in later Court of Appeal opinions.

Cases the *Bailey* court cited, but did not overrule, including cases from this court, support finding multiple counts of grand theft in this case. The Court of Appeal reviewed those cases, beginning with *People v. Stanford* (1940) 16 Cal.2d 247 (*Stanford*). In *Stanford*, the Court of Appeal explained, "a lawyer entrusted with control of an elderly woman's property obtained her permission to use her funds to buy property for her. (*Id.* at pp. 248-249.) He took title to the property in his own name and made three payments of the entrusted funds for its purchase, each of which exceeded the threshold amount constituting grand theft. (*Id.* at pp. 248-250.) Following his conviction of three counts of grand theft, the *Stanford* court affirmed, stating: 'There is no merit in appellant's contention that the entire transaction could not constitute more than one offense, and that the conviction of three separate offenses was error. . . . In the present case the evidence showed that the thefts referred to in the first three counts of the indictment were separate and distinct transactions, which occurred on different dates, and involved the taking of different sums of money. Such separate transactions constituted separate offenses. [Citations.]' (*Id.* at pp. 250-251.)"

5

The Court of Appeal also reviewed other cases that *Bailey* cited: "Among the cited cases are two Supreme Court decisions, *People v. Rabe* (1927) 202 Cal. 409 (*Rabe*) and *People v. Ashley* (1954) 42 Cal.2d 246 (*Ashley*). In *Rabe*, the defendant fraudulently obtained money and property by falsely representing that he intended to use the funds and property to establish a corporation. (*Rabe*, *supra*, 202 Cal. at p. 417.) From one individual he secured investments on three separate dates: a payment for $1,250, a payment for $4,000, and a contribution of real property worth $11,000. (*Ibid.*) Following his conviction of three counts of grand theft based on these acts, the Supreme Court rejected his contention that he had committed only a single offense, reasoning that '[i]n each count of the indictment the property . . . was obtained at a different time and was different in character and value . . . .' (*Id.* at p. 413.) In addition, the court stated that when a defendant obtains property through false representations to the victim, the defendant may be separately punished for obtaining additional property from the victim, even though the initial misrepresentations 'were still operating upon the mind' of the victim. (*Ibid.*)

"In *Ashley*, the manager of a corporation obtained funds from two individuals by falsely representing that the funds would be used for one of the corporation's business projects. (*Ashley*, *supra*, 42 Cal.2d at pp. 252-257.) Because the manager received two payments from each individual, each of which exceeded the threshold amount for grand theft, he was charged with four counts of grand theft. (*Ibid.*) Before the Supreme Court, he contended that he could be convicted on only one count of grand theft with respect to each victim. (*Id.* at p. 273.) Relying on *Rabe*, the court rejected this argument. (*Ibid.*)

"In the remaining cases cited in *Bailey*, appellate courts reached similar conclusions on similar facts. (*People v. Barber* (1959) 166 Cal.App.2d 735, 736-738 [defendant properly convicted of two counts of grand theft after obtaining two

6

payments exceeding minimum necessary for grand theft from single victim who intended to invest in defendant's bogus mining company]; *People v. Caldwell* (1942) 55 Cal.App.2d 238, 242-243, 252 [defendant who falsely represented he was providing insurance to victim properly convicted of five counts of grand theft based on five separate premium payments, each exceeding minimum necessary for grand theft]; *People v. Ellison* (1938) 26 Cal.App.2d 496, 497-499 [defendants properly convicted of three counts of grand theft for receiving three separate payments from creditor, each exceeding minimum necessary for grand theft, based on presentation of falsified contracts to creditor indicating that defendants were selling goods to others]."

Noting that the *Bailey* court did not overrule any of these cases, the Court of Appeal concluded that "*Stanford*, *Rabe*, and *Ashley* embody the reasonable view that a defendant who repeatedly takes property exceeding the requisite amount for grand theft from a victim through separate transactions [citation] — but pursuant to a single scheme or overarching misrepresentation — commits more crimes than a defendant who takes such property only once. Indeed, a contrary view would give a 'felony discount' to the thief who perfects a scheme to commit multiple acts of grand theft."

Several Court of Appeal decisions have interpreted *Bailey*, *supra*, 55 Cal.2d 514, differently. (See generally *People v. Jaska* (2011) 194 Cal.App.4th 971, 980-985.) As the Court of Appeal explained, "some courts have held that *Bailey* bars multiple convictions for grand theft when the individual thefts arise from a recognizable plan or scheme, even though each theft is separate and distinct, and involves property or money exceeding the amount needed for grand theft. The principal case is *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 324-325 (*Kronemyer*), which involved a lawyer who acted as the conservator of an elderly man. After the lawyer decided to loot the man's estate, he took all the funds in

7

four bank accounts, each of which contained more than $8,000. (*Id.* at pp. 327-328.) Following the lawyer's conviction of four counts of grand theft based on these transactions, the appellate court reversed three of the four convictions, reasoning that '[t]he fact these physically separated funds required four transactions does not avoid the single-plan single-offense rule discussed in [*Bailey*].' (*Id.* at p. 364.)" (See also *People v. Brooks* (1985) 166 Cal.App.3d 24 [reversing 12 of 13 counts of grand theft and one count of petty theft arising from the defendant's theft of auction proceeds]; *People v. Packard* (1982) 131 Cal.App.3d 622 [reversing two of three grand theft convictions based on the submission of a series of false invoices]; *People v. Gardner* (1979) 90 Cal.App.3d 42 [reversing three of four counts of grand theft of animal carcasses]; *People v. Richardson* (1978) 83 Cal.App.3d 853 [reversing three of four counts of attempted grand theft based on attempting to obtain payments on four fraudulent warrants]; *People v. Sullivan* (1978) 80 Cal.App.3d 16 [reversing eight of nine related counts of grand theft based on receipt of a series of cashier's checks pursuant to a single fraudulent scheme].)

The Court of Appeal declined to follow these cases, finding them contrary to *People v. Ashley*, *supra*, 42 Cal.2d 246, *Stanford*, *supra*, 16 Cal.2d 247, and *People v. Rabe*, *supra*, 202 Cal. 409.

We thus have cases distinguished but not overruled in *Bailey*, *supra*, 55 Cal.2d 514, that support multiple convictions of grand theft in this case, post-*Bailey* Court of Appeal cases relying on *Bailey* that would prohibit such multiple convictions, and *Bailey* itself. We must decide what the proper rule should be. We need not decide whether the *Bailey* rule regarding a series of *petty* thefts applies similarly to a series of *grand* thefts. As *Bailey*'s discussion of earlier cases upholding multiple convictions of grand theft implies, *Bailey* is factually distinguishable. The *Bailey* rule must be interpreted in light of its facts.

8

In *Bailey*, the defendant committed a single misrepresentation and then received a series of welfare payments due to that misrepresentation. Other than *omitting* to correct the misrepresentation and accepting the payments, the defendant committed no separate and distinct fraudulent acts. As the *Bailey* court explained, the trial court had instructed the jury it could aggregate into a single count of grand theft a series of petty thefts done pursuant to an "initial design" to obtain property exceeding the threshold amount that makes the crime grand theft. (*Bailey*, *supra*, 55 Cal.2d at p. 518.) The evidence supported a jury finding that the defendant did have an initial design to keep receiving the welfare payments until they exceeded that threshold amount. Accordingly, the court concluded that defendant had not committed "separate and distinct" offenses. (*Id*. at p. 519.) But in this case, and, generally, in the earlier cases the *Bailey* court distinguished, the defendant committed separate and distinct fraudulent acts.

This makes all the difference. When the *Bailey* court said that the earlier cases upholding multiple convictions of grand theft would not have done so "had the evidence established that there was only one intention, one general impulse, and one plan" (*Bailey*, *supra*, 55 Cal.2d at p. 519), it must have had this distinction in mind. *Bailey* concerned a single fraudulent act followed by a series of payments. The cases *Bailey* distinguished generally involved separate and distinct, although often similar, fraudulent acts. Accordingly, those cases involved "separate and distinct" (*ibid*.) offenses warranting separate grand theft convictions. This case is not similar to *Bailey* but rather to the cases it distinguished. Defendant committed a series of separate and distinct, although similar, fraudulent acts in preparing separate paperwork and documentation for each fraudulent transaction. Each fraudulent act was accompanied by a new and separate intent to commit that fraud.

9

As the Court of Appeal put it, a serial thief should not receive a "felony discount" if the thefts are separate and distinct even if they are similar. Accordingly, we conclude that a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme. Without deciding whether any particular post-*Bailey* Court of Appeal opinion was incorrect under its facts, we disapprove of any interpretation of *Bailey* that is inconsistent with this conclusion.

Defendant argues that principles of stare decisis prevent us from overruling *Bailey*. (See generally *People v. Latimer* (1993) 5 Cal.4th 1203, 1212-1216.) But we are merely interpreting *Bailey*, not overruling it. To be sure, we are disapproving some post-*Bailey* Court of Appeal decisions. But those cases misinterpreted *Bailey* and overlooked the fact that it cited and distinguished, but did not overrule, earlier cases, including some from this court, that support finding multiple grand thefts in cases like this. We are merely reaffirming those earlier cases. Under the circumstances, considerations of stare decisis "do not weigh as heavily" as in some cases. (*People v. Correa* (2012) 54 Cal.4th 331, 344.)

Defendant also argues that legislative inaction shows the Legislature supports the prevailing interpretation of *Bailey*. It is true that the Legislature has not addressed this precise point. It has not overruled *Bailey*'s holding permitting the accumulation of a series of petty thefts into one grand theft, or the appellate courts' broad interpretation of *Bailey*. In some circumstances, legislative inaction might indicate legislative approval of a judicial decision. (See *People v. Williams* (2001) 26 Cal.4th 779, 789-790.) "However, legislative inaction alone does not necessarily imply legislative approval. 'The Legislature's failure to act may indicate many things other than approval of a judicial construction of a statute: the sheer pressure of other and more important business, political considerations, or a tendency to trust to the courts to correct their own errors . . . .' " (*People v. King*

10

(1993) 5 Cal.4th 59, 75.) We see nothing in the legislative inaction that prevents this court from interpreting *Bailey* for the first time and reaching a conclusion consistent with the cases that *Bailey* discussed and distinguished.

Moreover, our conclusion is fully consistent with actions the Legislature *has* taken. Penal Code section 12022.6, subdivision (a), imposes sentence enhancements when the defendant "takes, damages, or destroys any property in the commission or attempted commission of a felony" if the loss exceeds specified amounts. Subdivision (b) of that section permits the aggregation of losses from multiple charges if they "arise from a common scheme or plan." (Pen. Code, § 12022.6, subd. (b).) The Legislature added the "common scheme or plan" language in 1992. (See *People v. Green* (2011) 197 Cal.App.4th 1485, 1493.) This language indicates the Legislature intended, or at least was aware, that multiple convictions can arise from multiple acts even if part of a common scheme or plan.

Defendant also contends we cannot constitutionally apply the rule we adopt to him. Here we agree. "Courts violate constitutional due process guarantees [citations] when they impose unexpected criminal penalties by construing existing laws in a manner that the accused could not have foreseen at the time of the alleged criminal conduct." (*People v. Blakeley* (2000) 23 Cal.4th 82, 91; see also *People v. Correa*, *supra*, 54 Cal.4th at pp. 344-345.) The Attorney General argues that *Bailey* does not prevent applying our interpretation to defendant. We agree. The problem, however, is not *Bailey* but the long, uninterrupted series of Court of Appeal cases, beginning with *People v. Sullivan*, *supra*, 80 Cal.App.3d 16, decided in 1978, and including *People v. Kronemyer*, *supra*, 189 Cal.App.3d 314, decided in 1987, that have consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft.

11

In *People v. Blakeley*, *supra*, 23 Cal.4th at pages 91-92, we held that an unintentional killing in unreasonable self-defense is voluntary manslaughter. However, because three Court of Appeal decisions had concluded, without contradiction, that such a killing was *in*voluntary manslaughter, we did not apply the new rule retroactively to the defendant. Under the circumstances, our decision was "an unforeseeable judicial enlargement of the crime of voluntary manslaughter, and thus may not be applied retroactively to defendant." (*Id*. at p. 92.) We reach a similar conclusion here. We do not suggest that any time we resolve a conflict between Court of Appeal decisions in favor of the rule less favorable to the defendant, we may not apply that resolution to that defendant. But given the numerous, and uncontradicted, Court of Appeal decisions over a long period of time that reached a conclusion contrary to ours, we believe today's holding is also an unforeseeable judicial enlargement of criminal liability for multiple grand thefts. Accordingly, that holding may not be applied to defendant.

In finding the enhancement allegation true that defendant took property valued at more than $200,000, the jury necessarily found that the grand thefts arose "from a common scheme or plan." (Pen. Code, § 12022.6, subd. (b).) The law as it had existed for decades before defendant committed his crimes permitted conviction of only one count of grand theft under those circumstances. Because defendant is entitled to the benefit of that law, he cannot be convicted of more than one count of grand theft. For this reason, we reverse the Court of Appeal's judgment, which had affirmed the grand theft convictions.

12

### III. CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with this opinion.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

## CONCURRING OPINION BY WERDEGAR, J.

I agree with the majority that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (Maj. opn., *ante*, at p. 10.) While this formulation of the aggregation rule for thefts differs somewhat from that in *People v. Bailey* (1961) 55 Cal.2d 514, it provides guidance that is relatively clear and is likely to accord with the defendant's culpability in most cases. Moreover, as Justice Liu observes in his concurring opinion, although a defendant may be *convicted* only of either the aggregated offense or one or more of the individual thefts, because the connections among the takings or the lack thereof may not be evident at the time of charging a prosecutor may *charge* the defendant both with one count of a larger, aggregated theft, and several counts of smaller, individuals thefts. (Conc. opn. of Liu, J., *post*, at p. 7.)

Although by the majority's stated standard defendant was permissibly convicted of multiple grand thefts, I also agree with the majority that because of the divergence between our statement of the rule and that previously articulated by the appellate courts, due process precludes application of the new standard to this defendant. (Maj. opn., *ante*, at pp. 11–12.)

Finally, I agree with Justice Liu's concurrence that logically the same aggregation rule must apply to grand thefts as to petty thefts. "Because the same definition of theft applies to grand thefts and petty thefts, the question whether a

series of related takings constitutes one or several thefts within the meaning of [Penal Code] section 484 is necessarily common to both grand thefts and petty thefts." (Conc. opn. of Liu, J., *post*, at p. 2.)

**WERDEGAR, J.**

**CONCURRING OPINION BY LIU, J.**


In *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), we held that when a defendant unlawfully takes property from the same victim on multiple different occasions, the defendant has committed only one theft if the various takings were committed pursuant to "one intention, one general impulse, and one plan." (*Id.* at p. 519.) The court today holds that under a proper construction of the *Bailey* rule, defendant committed 20 thefts, not one, on these facts. I agree and therefore join the court's opinion. But the court merely assumes, without deciding, that the *Bailey* rule applies here. (Maj. opn., *ante*, at p. 8.) I write separately to explain that the *Bailey* rule necessarily applies in this case because *Bailey* defined what constitutes a single theft within the meaning of Penal Code section 484. That holding applies to *all* categories of theft.

The central question addressed by the parties in this case was "whether the *Bailey* rule regarding a series of *petty* thefts applies similarly to a series of *grand* thefts." (Maj. opn., *ante*, at p. 8.) In declining to answer this question, the court leaves unresolved the "recurring issue" of "whether successive acts of theft constitute separate crimes or a single crime." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 12, p. 34.) The proper unit of prosecution is a question of legislative intent that arises when interpreting any criminal statute. (See *Sanabria v. United States* (1978) 437 U.S. 54, 70 ["Whether a particular course of conduct involves one or more distinct 'offenses' under the

statute depends on . . . congressional choice." ]; see generally Note, *Counting Offenses* (2009) 58 Duke L.J. 709.)  Answering a unit of prosecution question requires courts to determine when "the actus reus prohibited by the statute — the gravamen of the offense — has been committed more than once."  (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349, superseded by statute on other grounds as stated in *People v. Arndt* (1999) 76 Cal.App.4th 387, 393–394; see, e.g., *In re Carleisha P.* (2006) 144 Cal.App.4th 912, 919; *People v. Washington* (1996) 50 Cal.App.4th 568, 576–577.)

*Bailey* necessarily answered the unit of prosecution question for all thefts, not just petty thefts.  The crime of "theft" is defined by Penal Code section 484. In turn, a grand theft is defined to include any "theft" in which property of a certain value has been taken.  (Pen. Code, § 487, subd. (a); all undesignated statutory references are to the Penal Code.)  All thefts that are not grand thefts are petty thefts.  (§§ 486, 488.)  Because the same definition of theft applies to grand thefts and petty thefts, the question whether a series of related takings constitutes one or several thefts within the meaning of section 484 is necessarily common to both grand thefts and petty thefts.  (See *Gomez v. Superior Court* (1958) 50 Cal.2d 640, 645 ["The distinctions between grand and petty theft according to the Penal Code are in the type of article stolen, whether the article was taken from the person of another and in the value thereof.  (Pen. Code, §§ 484, 487, 487a, 488.) The elements of the crime remain the same with the exceptions noted."].)

We have authority to interpret what constitutes one discrete theft within the meaning of section 484, as well as what the enumerated bases for grand theft in section 487 mean.  But we have no authority to *invent* new types of grand theft beyond those authorized by the Legislature.  (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 516 [" 'the power to define crimes and fix penalties is vested exclusively in the legislative branch' "]; *People v. Harrison*

2

(1989) 48 Cal.3d 321, 332 [the "court is not to sit as a 'super-legislature' altering criminal definitions"]; *In re Lynch* (1972) 8 Cal.3d 410, 414.)  It would have been surprising for *Bailey* to have invented a new, nonstatutory category of grand theft out of multiple petty thefts because one of the enumerated types of grand theft at the time pertained to multiple acts of petty theft by an employee against his or her employer over a 12-month period.  (§ 487, subd. (b)(3).)  When the Legislature wants to allow aggregation of separate petty thefts into a single grand theft, it knows how to say so.  (See also §§ 484g, 484h [allowing aggregation of all thefts in a six-month period involving the use of the same forged or stolen credit card].)  Our decision in *Bailey* must be understood as having announced a general rule for determining what conduct, as a definitional matter, constitutes a single theft — not a special equitable rule, unmoored from the statutory definition of theft, that permits multiple small takings, but only small takings, to be aggregated into a single larger theft.

The welfare payments the defendant in *Bailey* received were small enough that, taken alone, each payment would have constituted a petty theft.  But *Bailey* said the question presented was "whether [the defendant] was guilty of grand theft *or* of a series of petty thefts . . . ."  (*Bailey*, *supra*, 55 Cal.2d at p. 518, italics added; see *id*. at p. 519 ["The test applied in [three Court of Appeal] cases in determining if there were separate offenses *or* one offense is whether the evidence discloses one general intent or separate and distinct intents." (italics added)].)  The repeated use of the disjunctive term "or" shows that *Bailey* was answering a unit of prosecution question, i.e., whether the acts in question constituted one offense *or* several offenses.  *Bailey* was not crafting a novel rule that allows a defendant to be found guilty of a single grand theft in circumstances where the defendant could *also* be found guilty of multiple petty thefts.

3

This explains why *Bailey* said the rule it announced also applies to the determination of when multiple large takings constitute one grand theft as opposed to several smaller grand thefts: "[A] defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey*, *supra*, 55 Cal.2d at p. 519.) The fact that *Bailey* was defining what constitutes a single theft, whether petty or grand, explains why the court felt it was necessary to address when multiple large takings constitute only one grand theft. *Bailey* was not considering two separate questions — i.e., (1) "When do several small takings constitute a single grand theft?" and (2) "When do several large takings constitute only one larger grand theft?" Instead, it was answering both questions simultaneously because those two questions are actually the same question: "When does a series of multiple related takings constitute only one theft?"

Over the five decades since *Bailey* was decided, the Courts of Appeal have consistently understood that *Bailey* was answering this definitional unit of prosecution question. (See *People v. Jaska* (2011) 194 Cal.App.4th 971, 980 [*Bailey* "considered 'whether [the defendant] was guilty of grand theft *or* of a series of petty thefts' " (italics added)]; *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1148–1149 [collecting cases]; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 363 ["A single criminal plan completed by a series of transactions over a period of time, each requiring the execution of separate documents to complete, *constitutes* but one crime." (italics added)]; *People v. Brooks* (1985) 166 Cal.App.3d 24, 30 [explaining that *Bailey* answered the "especially thorny" problem "of whether successive acts *constitute* separate crimes *or* a single crime" (italics added)]; *People v. Packard* (1982) 131 Cal.App.3d 622, 626 [citing *Bailey* for "the well-established rule that in a series of takings from the same individual,

4

there is a single theft if the takings are pursuant to one continuing impulse, intent, plan or scheme, but multiple counts if each taking is the result of a separate independent impulse or intent"]; *People v. Richardson* (1978) 83 Cal.App.3d 853, 866 ["The test applied in theft prosecutions in determining if there are separate offenses or one offense is whether the evidence discloses one general intent or distinct and separate intents."]; *People v. Neder* (1971) 16 Cal.App.3d 846, 852 ["In cases involving theft (by larceny, false pretenses, or embezzlement), where several takings are motivated by 'one intention, one general impulse and one plan,' the entire transaction is held to be a single crime."].)

The Attorney General argues that *Bailey*'s discussion of when multiple large takings constitute a single grand theft was dictum. She urges us to hold that multiple large takings constitute one grand theft if and only if they occur as part of a single transaction. By contrast, she says, multiple small takings may be treated as a single grand theft so long as each taking shares a common scheme or modus operandi. When asked at oral argument whether there could be any analytical justification for this uneven result, the Attorney General said, "I think there are policy reasons that it is justifiable. I don't know that analytically it is justifiable." But we are not free to invent new crimes, including new categories of grand theft, merely because there may be good policy reasons for us to do so. The Attorney General's policy argument is properly addressed to the Legislature. The *Bailey* rule necessarily applies with equal force regardless of whether the series of takings in question would each constitute petty thefts or grand thefts if considered in isolation.

Further, the Attorney General contends, as did the Court of Appeal below, that permitting multiple large takings to be treated as a single grand theft in some circumstances will give thieves an incentive to commit more thefts because they will face no additional criminal liability for additional takings. Today's opinion

5

clarifies that no such "felony discount" is available when a defendant takes "separate and distinct" actions that result in obtaining property from the same victim on "separate and distinct" occasions even if the defendant utilizes a similar or identical modus operandi. (Maj. opn., *ante*, at pp. 9–10.) But to the extent the *Bailey* rule provides any "discount" to defendants who take property pursuant to "one intention, one general impulse, and one plan" (*Bailey*, *supra*, 55 Cal.2d at p. 519), it is up to the Legislature to determine whether the rule should be otherwise.

As noted, the Legislature has responded to precisely such concerns in the limited contexts of credit card theft (§§ 484g, 484h) and theft by employees against their employers (§ 487, subd. (b)(3)). (Cf. *People v. Correa* (2012) 54 Cal.4th 331, 345–346 [documenting the Legislature's decision to override the Court of Appeal's unit of prosecution analysis with respect to former § 12020, which prohibits possession of sawed-off shotguns].) At the same time, there are reasons why the Legislature might hesitate to treat every taking as a separate theft. For example, reasonable minds can differ as to whether a defendant who accepts 12 fraudulently obtained payments of $1,000 per month during a single year from the same victim is 12 times more blameworthy than a defendant who successfully plots for an entire year to steal $25,000 from the same victim. Moreover, the Legislature has already provided a mechanism for imposing additional punishment where a series of related takings, each of which is large enough to qualify as grand theft, results in aggregate losses exceeding specified amounts. (§ 12022.6, subds. (a), (b).) We have no authority to supplement the statutory scheme with our own policy judgments as to the relative blameworthiness of various theft acts.

Applying the *Bailey* rule evenhandedly to petty thefts and grand thefts will not unduly limit a prosecutor's charging discretion. If a defendant has engaged in multiple related takings, a prosecutor is not prohibited from charging the

6

defendant both with one count of a larger (aggregated) theft and with several counts of smaller (individual) thefts.  A prosecutor may charge a defendant under both theories, since it may not be evident at the time of charging whether the takings were "committed pursuant to one intention, one general impulse, and one plan." (*Bailey*, *supra*, 55 Cal.2d at p. 519; see *ibid.* ["Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case . . . ."].)  But the jury may only convict the defendant of *either* the aggregated theft *or* one or more separate thefts, depending on whether the takings were committed pursuant to the same intention, general impulse, and plan. If they were, then only a conviction on the aggregated offense is appropriate; if not, then no conviction on the aggregated offense is appropriate.  The application of this rule does not and cannot turn on whether each taking, if considered in isolation, was a petty theft or a grand theft.

I conclude with a brief comment on the concerns raised by our dissenting colleague.  Justice Rushing agrees with Justice Werdegar and me that "there can be no justification for varying the unit of prosecution in theft cases according to the value of the property taken." (Dis. opn., *ante*, at p. 24.)  But his broader concern is that our holding today — "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme" (maj. opn., *ante*, at p. 10) — largely displaces *Bailey*'s rule of aggregation for multiple takings "committed pursuant to one intention, one general impulse, and one plan" (*Bailey*, *supra*, 55 Cal.2d at p. 519).  (Dis. opn., *post*, at pp. 3–10.)

Although this concern is prompted by a quite thoughtful review of the case law, it reads too much into what today's opinion actually says.  The terms "single overarching scheme" and "common scheme or plan," as used in today's opinion (maj. opn., *ante*, at pp. 10, 11), are properly understood to mean similarity in how

7

a series of takings was performed, i.e., a modus operandi.  Indeed, that is the basis for our conclusion that defendant committed 20 thefts, not one, on the facts here: Defendant stole 20 different vehicles from his employer on 13 different days, repeatedly using one of two fraudulent methods to execute the fake sales.  We are careful to disapprove post-*Bailey* Court of Appeal decisions only to the extent they construed *Bailey* to find one theft "in cases like this."  (Maj. opn., *ante*, at p. 10.)  Today's opinion clarifies that a common scheme or modus operandi is different from a single impulse.  In other words, separate and distinct takings do not fall under *Bailey*'s aggregation rule simply because, as here, they were all done the same way.  But neither does the mere fact that multiple takings are separate and distinct entail a finding of multiple thefts in every case.  If the takings were committed pursuant to a single intention, impulse, and plan, then under *Bailey* they amount to only one theft.

Of course, each case will continue to depend on its facts.  Just as *Bailey* itself must "be interpreted in light of its facts" (maj. opn., *ante,* at p. 8), the same goes for our decision today.  But apart from the need to treat petty thefts and grand thefts equally under *Bailey*, today's decision does not portend the arbitrariness that Justice Rushing fears.  Notably, although our opinion characterizes the facts of *Bailey* as involving "a single fraudulent act followed by a series of payments" (maj. opn., *ante*, at p. 9), *Bailey* is just as easily characterized as involving multiple acts (each receipt of a welfare payment counts as one) pursuant to a single impulse or "initial design" (*Bailey*, *supra*, 55 Cal.2d at p. 518).  Applying the relevant concepts — what is an "act," what is an "impulse" — will be straightforward in some cases and more challenging in others.  But our decision does not require or encourage courts to start counting the number of tools in a stolen tool set, the number of trousers in a stolen wardrobe, or the number of arm movements in stealing several wristwatches from a carton.  (Dis. opn., *ante*, at

8

pp. 7–10.) In this area, as in others, proper application of the law has much more to do with practical judgment than pure logic or metaphysics.

LIU, J.

**DISSENTING OPINION BY RUSHING, J.**


I am unable to concur in either the reasoning of the majority opinion or in its result.[1]  At its core is the proposition that cases interpreting *People v. Bailey* (1961) 55 Ca1.2d 514 (*Bailey*) have mistakenly understood that case to require the aggregation of multiple thefts into a single charge whenever the thefts arise from a " 'common scheme or plan.' "  (Maj. opn., *ante*, at p. 12, quoting jury finding under Pen. Code, former § 12022.6, subd. (b) (section 12022.6(b)).)  Because the jury here found such a "common scheme or plan" in a different context, the majority reasons, existing law compels reversal of 19 out of defendant's 20 grand theft convictions.  Henceforth, however, some other rule or rules will govern such questions.

In fact, however, no court before today has so much as hinted that the rule of *Bailey* is coextensive with the concept of a "common scheme or plan."  This court itself has authoritatively construed that phrase to have a meaning not only distinct from, but incompatible with, its application in the present context.  Yet based on its novel equation of these two distinct concepts, the majority declares that some unspecified body of case

---

[1]  I am also unable to fully concur in Justice Liu's separate opinion.  Where our views diverge is in our interpretation of the majority opinion in other respects.  His reading enables him to concur in the result; mine does not.  This divergence may be a harbinger of the confusion I fear today's decision will wreak in the lower courts.

law must be disapproved, and suggests that a competing body of case law predating *Bailey* must be re-enlivened instead.

I find this approach to the problem both analytically unsound and pragmatically unwise. It seems destined to sow greater uncertainty than ever among those tasked with applying the law of theft. By authoritatively declaring that existing law requires aggregation of felonies whenever they are part of a "common scheme or plan," the majority has invited defendants in cases not yet final to challenge multiple-count convictions that would otherwise be considered entirely sound. With respect to future cases, the majority has cast not only the meaning but even the continued existence of the *Bailey* rule in doubt. In its place the majority raises up a body of authority that was limited to insignificance by *Bailey*—and rightly so, because it stood for a rule that is simplistic in concept, arbitrary in result, and in some respects simply unworkable. Lower courts will now undoubtedly rediscover these vices, but will have to cope with them as best they can, unaided by anything resembling a clear and predictable rule. Further, because the majority implies that different rules may govern the treatment of multiple takings depending on the value of property taken, the lower courts will be forced to guess not only at whether such a distinction exists, but at what rules apply if it does.

I would instead reaffirm and clarify the rule of *Bailey*. Properly understood, it furnishes no basis for reversal of the judgment before us. However it does serve a number of salutary functions beyond the one the majority seems to think worth preserving, i.e., to aggregate a number of smaller takings into a grand theft charge. It can also obviate certain analytical problems in defining the actus reus in theft offenses, as well as difficulties of proof that can arise under a rule rigidly declaring each taking a distinct offense. Most fundamentally, however, as applied to numerous larger takings, the *Bailey* rule can avoid dramatic differences in result arising from the fortuity that a criminal impulse is executed through numerous subsidiary takings rather than a single

2

act.  I find entirely inadequate the majority's critique of such a rule, i.e., that it allows a "felony discount" to its beneficiaries.  Finally, I cannot accept the suggestion that the aggregation of offenses, though eliminated or sharply curtailed with respect to multiple large takings, may be preserved in cases where it operates to elevate a number of petty thefts into a grand theft.  Like Justice Liu, I find such a double standard wholly unjustifiable, as well as invasive of the Legislature's exclusive power to define criminal offenses.

## I.  *Bailey*'s Impulse Rule

The question before us is one of the "unit of prosecution," i.e., "what constitutes a single instance of [the] crime."  (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 186.)  Subject to the paramount power of the Legislature to define criminal conduct, courts have recognized three conceptual approaches to such problems:  an "[a]ct-[b]ased [a]pproach," which focuses on each physical act in violation of the governing statute (Note, *Counting Offenses* (2009) 58 Duke L.J. 709, 722); a "[c]riminal [i]mpulse-[b]ased [a]pproach," under which a series of acts may be viewed as a single offense if they occur pursuant to a single originating impulse (*id.* at p. 717); and a "[t]ime-[b]ased [a]pproach," which defines an offense chronologically (*id.* at p. 728).

The Legislature has explicitly adopted a time-based unit of prosecution to define grand theft in a few specific circumstances.[2]  In all other cases the determination of the unit of prosecution in theft offenses has been left to case law.  Although no court has yet expressed the point this way, I read the cases to mean that *as a general rule*, each act in

---

[2]  Thus an employee commits grand theft by stealing from an employer "money, labor, or real or personal property . . . aggregate[ing] nine hundred fifty dollars ($950) or more in any 12 consecutive month period."  (Pen. Code, § 487, subd. (b)(3).)  It is also grand theft to use a forged or stolen credit card to obtain things with a value exceeding $950 "in any consecutive six-month period."  (Pen. Code, § 484g.)  A similar rule applies to the submission of fraudulent credit card charges by a retailer.  (Pen. Code, § 484h.)

3

violation of the theft statutes—i.e., each misappropriative act—will support a separate charge and a separate conviction. The threshold question is whether "the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once." (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349; see, e.g., *In re Carleisha P.* (2006) 144 Cal.App.4th 912, 919; *People v. Washington* (1996) 50 Cal.App.4th 568, 576-577.) If it has, the question becomes whether these otherwise severable acts fall within some exception requiring their treatment as a single offense.

In *Bailey*, Chief Justice Phil Gibson, joined by Justice Roger Traynor and the other members of the court, clearly recognized such an exception by adopting an impulse-based unit of prosecution rule. The defendant there was convicted of grand theft by false pretenses based on a series of welfare payments she secured by misrepresenting the status of a cohabitant. Each payment was below the $200 threshold then delineating grand theft. The trial court instructed the jury that if the takings were "done pursuant to an initial design to obtain from the owner property having a value exceeding $200," there was "one crime of grand theft," but that without such an "initial design," she had committed petty theft. (*Bailey*, *supra*, 55 Cal.2d at p. 518.) The court held this instruction proper and affirmed the defendant's conviction for grand theft.

In doing so the court cited three bodies of case law with approval. The first was cases involving "theft by false pretenses," which it described as holding "that where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft." (*Bailey, supra*, 55 Cal.2d at p. 518, citing *People v. Robertson* (1959) 167 Cal.App.2d 571, 576-577; *Dawson v. Superior Court* (1956) 138 Cal.App.2d 685, 686 et seq.; *People v. Lima* (1954) 127 Cal.App.2d 29, 34.) The second was "larceny and embezzlement cases" following "the same rule" and holding "that where a number of takings, each less than $200 but aggregating more than that sum, are all motivated by one

4

intention, one general impulse, and one plan, the offense is grand theft." (*Bailey*, *supra*, at p. 519, citing *People v. Fleming* (1934) 220 Cal. 601, 610-611; *People v. Howes* (1950) 99 Cal.App.2d 808, 818-821; *People v. Yachimowicz* (1943) 57 Cal.App.2d 375, 381; *People v. Dillon* (1934) 1 Cal.App.2d 224, 228-229; *People v. Bratton* (1932) 125 Cal.App. 337, 342-344; *People v. Sing* (1919) 42 Cal.App. 385, 395-396; *People v. Ashley* (1954) 42 Cal.2d 246, 279, fn. 3 (conc. & dis. opn. of Schauer, J.).) The *Bailey* court then cited *People v. Stanford* (1940) 16 Cal.2d 247, 250-251, for the proposition that "[w]hether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey*, *supra*, at p. 519.)

The *Bailey* court expressly disapproved three cases "insofar as they are inconsistent with the views expressed herein." (*Bailey*, *supra*, 55 Cal.2d at p. 519.) In the first, *People v. Scott* (1952) 112 Cal.App.2d 350, 351, the defendant challenged his conviction on multiple counts of grand theft on the ground that the trial court had erred in refusing to instruct the jury "that if several acts of taking were done pursuant to one design, the same constitutes one offense only." (Footnote omitted.) The Court of Appeal dismissed the contention with the terse observation that it "[wa]s not the law." (*Id.* at p. 351, fn. 4.) By disapproving the case, the *Bailey* court clearly conveyed that the rejected instruction was, in fact, the law. In the second disapproved case, *People v. Serna* (1941) 43 Cal.App.2d 106, 107-109, the court acknowledged the existence of a single-impulse rule but held that the defendant's receipt of relief payments under false pretenses was a series of petty thefts, rather than a single grand theft, because he was required to warrant his continuing eligibility for benefits in endorsing each payment. In rejecting that holding, the *Bailey* court implicitly conveyed that an impulse rule can operate to

5

unify multiple misrepresentations as well as multiple receipts of property flowing from a single original misrepresentation.  The third disapproved case, *People v. Miles* (1940) 37 Cal.App.2d 373, 378-379, had likewise suggested that payments received under later additional misrepresentations would necessarily constitute separate offenses.

The most subtle passage in *Bailey* is undoubtedly its treatment of a body of cases to which I will sometimes refer as the *Rabe*[3] cases.  According to the court, these cases "held that each receipt of property obtained by false pretenses constituted a separate offense for which the defendant could be separately charged and convicted."  (*Bailey, supra*, 55 Cal.2d at p. 519, citing *People v. Ashley*, *supra*, 42 Cal.2d at p. 273; *People v. Rabe, supra,* 202 Cal. at pp. 413-414; *People v. Barber* (1959) 166 Cal.App.2d 735, 741-742; *People v. Caldwell* (1942) 55 Cal.App.2d 238, 250-251; *People v. Ellison* (1938) 26 Cal.App.2d 496, 498.)  Chief Justice Gibson noted that "none of these decisions" had "discussed the rule" previously described, under which multiple takings pursuant to a single intention, impulse, or plan constituted a single offense.  (*Bailey*, *supra*, at p. 519.) He then observed, "[It] does not appear that the convictions [in those cases] would have been affirmed had the evidence established that there was only one intention, one general impulse, and one plan."  (*Ibid.*)  As I read this sentence, it means that (1) those cases either overlooked or ignored the single-impulse rule; and (2) they are either in harmony with it by virtue of undisclosed facts, or they are wrong.  The leading treatise on California law describes *Bailey* as classifying one of these cases—and by logical extension all of them—as "involving no general intent or overall plan," which I take to mean that they stand only for the unremarkable proposition that in the *absence* of a single unifying impulse, each taking will support a separate charge and conviction.  (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 13, p. 36.)

---

[3]  *People v. Rabe* (1927) 202 Cal. 409.

It is thus apparent that *Bailey* contemplated a single neutral rule requiring the aggregation of theft offenses—regardless of the value of the property taken—when they charge a series of takings all arising from a single criminal impulse or intention. In doing so it ratified a principle that had been part of California law since at least 1919 (see *People v. Sing*, *supra*, 42 Cal.App. 385, 395-396) and that reflects the great weight of authority elsewhere (see Annot., Series of Takings Over a Period of Time as Involving Single or Separate Larcenies (1973) 53 A.L.R.3d 398; *People v. Cox* (1941) 36 N.E.2d 84, 86 [286 N.Y. 137, 143] ["The same rule applies in England . . . ."].).

Cases following *Bailey* have applied this rule in three distinct situations. The first is where the defendant forms an initial intention to steal a *defined body of property*, and then carries out this intention through multiple acts. This situation arises most obviously where an original larcenous intention is effectuated through a series of asportations.[4] A hypothetical example would be a defendant who forms an intention to steal a tool set from a garage, and who executes this intention by making repeated trips from the garage

---

[4] Simple larceny is the physical taking of the victim's property. (Pen. Code, § 484, subd. (a) ["Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft."].) The actus reus is said to have " 'two aspects: (1) achieving possession of the property, known as "caption," and (2) carrying the property away, or "asportation." ' " (*People v. Williams* (2013) 57 Cal.4th 776, 794, quoting *People v. Gomez* (2008) 43 Cal.4th 249, 254-255.) Critically, " 'the slightest movement may constitute asportation . . . .' " (*Id.* at p. 255.) And "[w]hile there must be such a carrying away . . . as to supersede the possession of the owner, such an interference with the owner's possession need be only for an appreciable interval of time, be it ever so short." (*People v. Dukes* (1936) 16 Cal.App.2d 105, 108.) Thus a shoplifter's mere placing of a coat into a paper bag has been held to satisfy the asportation requirement (*People v. Tijerina* (1969) 1 Cal.3d 41, 47), as has a would-be thief's removing a purse from a car, though he dropped it to the ground immediately thereafter (*People v. Quiel* (1945) 68 Cal.App.2d 674, 679).

7

to a waiting van.**5** Each such trip could qualify technically as a separate larceny (see fn. 4), but they are unified into a single theft by the original impulse to steal the entire set. One court has usefully described such situations as involving "a *single offense* committed incrementally." (*In re David D.* (1997) 52 Cal.App.4th 304, 310.) A real-life example is provided by *People v. Dillon*, *supra*, 1 Cal.App.2d 224, where the defendant stole 100 dozen work shirts, 3,000 yards of fabric, and 30 dozen trousers from his employer. On appeal from his conviction on three charges of grand theft, he contended that the evidence failed to support a finding that any one lot of merchandise (i.e., shirts, fabric, or trousers) was taken at one time, and thus could not justify combining each lot under a single count, so as to establish the requisite value for grand theft. The court first concluded that the evidence indeed supported such a finding. (*Id.* at p. 229.) It then seemed to describe the offense, dubiously, as akin to embezzlement, so that it was only complete upon the "wrongful disposal" of the property.**6** (*Ibid*.) The court then cited the

---

**5** A Texas court gave the example of driving a wagon to a field and carrying a pile of cotton to it one basketful at a time. (*Cody v. State* (Tex. Crim. App. 1892) 31 Tex.Crim. 183, 184 [20 S.W. 398], cited in Annot., Series of Takings, *supra*, 53 A.L.R.3d at p. 405.)

**6** The court's reluctance to rely exclusively on the single-impulse rule may reflect an awareness of the *Rabe* cases with their strict act-based approach. Nonetheless the other rationales offered by the court seem manifestly unsound. The crime was larceny, and a misappropriative act was certainly completed each time the defendant removed an item of property from his employer's premises, if not before. Even if the property had been entrusted to him so as to support an embezzlement theory, he converted each item to his own use, and thus committed the offense, as soon as he exercised dominion over it for his own purposes—again, presumably, by removing it from the store. In the absence of evidence concerning the timing of these removals, and the quantity of merchandise involved in each, there would indeed be a failure of proof as to the *value* of each taking— unless they were aggregated under the single-impulse rule.

At the same time, in finding the defendant guilty of three thefts—one for each lot—the trial court had necessarily found that the defendant formed a distinct intention to

*(footnote continued on next page)*

8

single-impulse rule in support of the judgment:  "When appellant once formed *the felonious intent to take from the warehouse a certain quantity of merchandise* in his custody and deliver the same to [the buyer], and then executed that intent by delivery thereof, all the elements necessary to constitute the offense of theft were united, and but one offense is committed, though there may have been several deliveries, for in such case there occurs the union or joint operation of act and intent prescribed by law.  [Citation.] *A transaction comprising successive acts of taking, set in motion under a single felonious impulse and operated upon by a single unintermittent force, constitutes a continuous act and must be treated as one larceny.*  [Citation.]"  (*Ibid*., italics added.)

Another illustration is provided by *People v. Kronemyer*  (1987) 189 Cal.App.3d 314 (*Kronemyer*), where an attorney committed various defalcations against a client falling into "illness and mental deterioration."[7]  (*Kronemyer*, *supra*, at p. 363.)  As relevant here, the case held that the emptying of several savings accounts within a four-day span constituted a single offense because the defendant "intended to steal all these

_____

*(footnote continued from previous page)*
steal each lot; otherwise the facts would only have sustained one conviction for all three lots.  The case thus illustrates the distinction between the impulse rule, correctly applied, and the overbroad rule the majority attributes to current case law.

[7]  The majority designates *Kronemyer* as the "principal case" following *Bailey*. (Maj. opn., *ante*, at p. 7.)  I cannot vouch for the accuracy of this characterization, but the case certainly stands out for its ability to touch a judicial nerve, involving as it does grievous breaches of the highest professional duties of fidelity, loyalty, and integrity.  But as the court there observed, the Legislature, whose exclusive responsibility it is to fix punishments for crimes, has already provided sentence enhancements for thefts involving exceptionally high-value property.  (*Kronemyer, supra,* 189 Cal.App.3d at p. 364; see Pen. Code, §§ 12022.6, 186.11.)  If it wishes to create additional enhancements based upon particularly egregious violations of fiduciary or professional duties, it can certainly do so.  Abhorrence of one defendant's conduct is no basis to retreat from a rule that has been part of our law for 95 years.

accounts at or before [the time] he first came into possession of the powers of attorney which allowed him to close them." (*Ibid.*) That conclusion was all but compelled by the prosecutor's insistence that the accounts had all been emptied pursuant to a "preconceived plan" to " 'loot' " the estate. (*Ibid.*) Thus the court reversed, on the basis of the single-impulse rule, three of the four counts arising from theft of the savings accounts.

In fact patterns of this kind, treating multiple acts as a single continuing offense is partly justified by considerations of culpability, partly by an aversion to arbitrary or fortuitous differences in result, partly by administrative concerns, and partly by considerations of analytical necessity. The first two considerations are embodied in the concept that where a defendant sets out to steal specific property, the resort to multiple physical acts to achieve that preconceived end is a mere happenstance; to predicate multiple charges on it may smack of arbitrariness. Thus if Larcenous Larry snatches a carton containing two dozen $1,000-dollar wristwatches from a loading dock, he has clearly committed only one felony, because there has been only one caption and asportation. Yet under a strict acts-based approach, his offense would be transmuted into 24 felonies if the carton's integrity were so impaired that he could not use it as a container but had to stuff each watch into a sack before vacating the area. His intent in both cases would be exactly the same. The result would be exactly the same. The only difference is that the second situation would require more arm movements. Yet by my calculations, treating each act as a separate grand theft would increase the maximum punishment from three years to 15 years four months. (See Pen. Code, §§ 489, subd. (c), 1170, subd. (h)(1), 1170.1, subd. (a).) A properly formulated and administered impulse rule helps to avoid such arbitrary discrepancies.

The second category of cases in which *Bailey*'s single-impulse rule has been applied involves the defendant's fraudulently securing a *continuous stream of income*

10

from the victim, in the form of regular periodic payments.[8]  This indeed was the situation in *Bailey* itself, where the defendant secured welfare payments by misrepresenting the status of a cohabitant.  Application of the single-impulse rule may be explained by analogizing the stream of payments to the specific property targeted in the situations described above.[9]

Two decisions suggest a third distinct application of the single-impulse rule: where multiple takings all arise from a sense of grievance or hostility towards the victim. (See *People v. Howes, supra,* 99 Cal.App.2d at p. 820 [employee's continuous stealing of tires from employer was properly charged as single count of theft where "the entire

---

[8]  Where the defendant has only issued *a single misrepresentation*, a finding of multiple thefts might seem to run afoul of the rule that "a charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once." (*Wilkoff v. Superior Court, supra,* 38 Cal.3d at p. 349.)  The actus reus of theft by false pretenses is the making of a false representation, on the basis of which the victim then voluntarily transfers property to the defendant.  (See *People v. Williams*, *supra*, 57 Cal.4th at p. 787, quoting *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842 [elements of theft by false pretenses are that " '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation' "].) Numerous cases have held, however, that each transfer may support a separate conviction, at least in the absence of a unifying impulse or intent.  They apparently analogize the defendant's receipt of the victim's property to the physical taking involved in larceny.  The analogy seems unsound.  (*Williams*, *supra*, at p. 787 [theft by false pretenses cannot be predicate offense for robbery because, "unlike larceny," it "has no requirement of asportation"].)  However that question exceeds the scope of the issues presented on this appeal.

[9]  Such thefts may also be compared to theft from a *physical* stream, as where the defendant steals water, electricity, or a similar commodity by unlawfully tapping a pipe or line.  (See, e.g., *Reynolds v. State* (1960) 101 Ga.App. 715 [115 S.E.2d 214, 217] [setting aside all but one conviction for stealing water by bypassing meter; "The great weight of authority in other jurisdictions is that a continuing larceny of material moving through pipes, such as water or gas, constitutes one continuing offense."].)

11

plan . . . was in furtherance of his design to secure personal and monetary satisfaction for his treatment at the hands of his employers"]; *People v. Yachimowicz, supra,* 57 Cal.App.2d at p. 381 [stealing of guns, though not shown to have occurred on single occasion, was properly charged as one offense; "the entire plan of stealing resorted to by appellant was in furtherance of his design to secure personal and monetary satisfaction for his treatment at the hands of his employers"].)  The rationale appears to be that the defendant's ulterior injurious or retributive motive constitutes a common impulse linking the takings into a single offense.  While the soundness of this rationale is open to debate—and nothing in the facts before us supports its application here—it does point to a narrow and easily administered rule for which a basis appears in precedent.

## II.  Single-Impulse Rule vs. Common Scheme or Plan

### A.    Distinction Between Concepts

In concluding that 19 of defendant's 20 theft convictions must be set aside, the majority appears to reason as follows:  (1) Under the prevailing interpretation of *Bailey*, multiple takings will sustain only one theft conviction if they all "arose 'from a common scheme or plan' "; (2) the jury found that defendant's takings all "arose 'from a common scheme or plan' "; (3) therefore, defendant committed only one theft under current law. (Maj. opn., *ante*, at pp. 11-12.)  This conclusion provides much if not all of the momentum for the majority's oblique erosion of *Bailey* and the 95 years of precedent it represents.  But the syllogism above is fatally defective.  Its major premise, equating *Bailey*'s single-impulse rule with a "common scheme or plan"—which the jury found here pursuant to an instruction under section 12022.6(b)—is not only unsupported by authority, but irreconcilable with the clear meaning and effect of the two rules.

The central predicate for *Bailey*'s impulse rule—repeated three times on one page—is the existence of "*one* intention, *one* general impulse, and *one* plan."  (*Bailey, supra*, 55 Cal.2d at p. 519; italics added.)  The core conception is that multiple acts may

12

constitute a single offense when they are all the products of *the same distinct criminal impulse* on the part of the defendant.  The resulting takings are thus properly viewed as "a *single offense* committed incrementally" (*In re David D.*, *supra*, 52 Cal.App.4th at p. 310) or " 'a large total taking accomplished by smaller takings.' " (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 457, quoting *People v. Neder* (1971) 16 Cal.App.3d 846, 853.)

This concept is not congruent with the requirement of a "common scheme or plan" under section 12022.6(b).[10]  That statute authorizes enhanced punishment for crimes in which the defendant takes, damages, or destroys property with value over specified thresholds.  (Pen. Code, § 12022.6, subd. (a).)  As pertinent here, it states that if the defendant is accused of "*multiple charges*" involving such harm to property, the applicable enhancement "may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and *arise from a common scheme or plan*."  (§ 12022.6(b), italics added.)

Before delving into the meaning or function of this phrase, it must be observed that under the majority's reading of currently prevailing case law, the subdivision just quoted has never been properly applied to theft charges.  According to the majority, existing law prohibits multiple charges arising from a common scheme or plan; hence any and all criminal acts so arising would have to be combined into a single charge, and

---

[10]  At least one state allows prosecutions on a theory of "theft by common scheme." (*State v. Milhoan* (1986) 224 Mont. 505, 510 [730 P.2d 1170, 1173].)  The theory, however, is expressly authorized by statute.  (Mont. Rev. Code Ann., § 45-6-301(9).)  The statutory definition of "[c]ommon scheme" includes *both* the concept of "a purpose to accomplish a single criminal objective" and that of "a common purpose or plan that results in the repeated commission of the same offense or that affects the same person or the same persons or the property of the same person or persons."  (*Id.*, § 45-2-101(8).)

13

there could never be an occasion to resort to section 12022.6(b), which applies only to multiple charges. The value for purposes of the enhancement would always be limited to the property taken in the one theft properly charged. If such a case were erroneously pled and sustained as multiple counts—as occurred here, according to the majority—all but one of the counts would presumably be vulnerable to dismissal or reversal on appeal—as the majority directs here. Presumably this means that the property affected by the dismissed counts could no longer be included in calculating the enhancement. In any event, under the majority's construction of existing law, section 12022.6(b) would never come into play.[11]

In fact, however, the "common scheme or plan" rubric in section 12022.6(b) has nothing to do with the aggregation of distinct acts into a single charge; indeed, it is inherently incompatible with such aggregation. The former iteration of section 12022.6 was originally adopted in 1976. (Stats.1976, ch. 1139, § 305.5, p. 5162.) In *People v. Bowman* (1989) 210 Cal.App.3d 443, 447, the court concluded that the statute, as then framed, did not permit the aggregation of multiple offenses, however closely related, for purposes of determining whether the monetary thresholds for the enhancement had been met. The court urged the Legislature to address the matter (*ibid*.), and the Legislature did so, amending section 2022.6 in 1990 to provide that where "multiple charges of taking, damage, or destruction" were brought, "the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts

---

**11** The majority acknowledges that the inclusion of the "common scheme or plan" language in section 12022.6 reflects a legislative intention, or "at least" awareness, that "multiple convictions can arise from multiple acts even if part of a common scheme or plan." (Maj. opn., *ante*, at p. 11.) That legislators would have such an understanding is hardly surprising. Before today there was no reason to suppose that multiple theft convictions could be precluded by the mere presence of a "common scheme or plan."

14

specified in this section." (Stats. 1990, ch. 1571, § 1, p. 7493.) In 1992 the statute was again amended to limit such aggregation to cases where the multiple offenses all "arise from a common scheme or plan." (Stats. 1992, ch. 104, § 1, p. 342.)

When the Legislature added this language to section 12022.6(b), the phrase "common scheme or plan" had long been used to define an exception to the rule prohibiting evidence of uncharged misconduct to prove conduct on a particular occasion. (See 1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, §§ 94-97, pp. 486-495.) In that context, "[t]he notion of 'common plan' refers to a *methodology or peculiar behavior pattern*." (*Id.*, § 94, at p. 487, italics added.) The concept is quite distinct from *Bailey*'s single original criminal impulse. The touchstone of the "common scheme or plan" exception is similarity between acts; but such similarity is neither necessary nor sufficient to establish the applicability of *Bailey*. Instead *Bailey*'s impulse rule depends on the presence of a single criminal impulse—a condition that is neither necessary nor sufficient to establish the presence of a "common scheme or plan."

The distinction between the two concepts was highlighted by then-Justice George in *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*), which is the leading modern case on the scope of the "common scheme or plan" exception. *Ewoldt* was a prosecution for lewd acts on a child, in which this court held that the victim's sister had properly been allowed to testify that the defendant committed similar acts upon her. The court alluded repeatedly to the distinction between offenses committed in accordance with a common scheme or plan on the one hand, and a single continuous offense on the other. It criticized *People v. Tassell* (1984) 36 Cal.3d 77, as resting on "the erroneous premise" that the common scheme or plan exception only applies where the charged and uncharged acts "are part of a single, continuing conception or plot." (*Ewoldt*, *supra*, at p. 399.) The same vice appeared in *People v. Ogunmola* (1985) 39 Cal.3d 120 (*Ogunmola*), which found error in the admission of testimony by two patients that the defendant gynecologist

15

had raped them in the same distinctive manner as he was accused of raping the victims in the charged offenses.  Of that decision Justice George wrote, "It is difficult to imagine a stronger example of *separate crimes, committed pursuant to a common design or plan* . . . .  The marked *similarity between the uncharged criminal acts and the charged offenses* constituted strong circumstantial evidence that the defendant had developed a plan to engage in sexual intercourse with his patients without their consent and in the unusual manner described."  (*Ewoldt*, *supra*, at p. 400, italics added.)

Declaring that both *Tassell* and *Ogunmola* occupied an "anomalous position in more than 50 years of California case law," the court overruled them "to the extent they hold that evidence of a defendant's uncharged similar misconduct is admissible to establish a common design or plan only where the charged and uncharged acts are part of a *single, continuing conception or plot*."  (*Ewoldt, supra,* 7 Cal.4th at p. 401, italics added, fn. omitted; see *id.* at p. 387 [describing cases as "disapprove[d]"].)  At the same time, the court described approvingly a case holding that "evidence establishing that the defendant committed a *similar but unconnected offense*" was admissible.  (*Id.* at p. 400, discussing *People v. Ruiz* (1988) 44 Cal.3d 589, italics added.)  The correct rule, the court emphasized, rested not on any unifying intention or continuous plot, but on similarities between charged and uncharged acts:  "[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are *sufficiently similar* to support the inference that they are manifestations of a common design or plan."  (*Id.* at pp. 401-402.)

The "common scheme or plan" exception thus contemplates a recurring criminal *pattern*, such as a repeated strategy or modus operandi, by which the defendant perpetrates multiple distinct crimes.  An impulse rule, in contrast, contemplates something more nearly resembling the "single, continuing conception or plot" from which this court took such pains in *Ewoldt* to *distinguish* the "common scheme or plan"

16

descriptor.  (*Ewoldt*, *supra*, at pp. 396, 400, 401.)  Under an impulse rule, the jury must be persuaded that all of the charged takings were conceived at the same time, and thus represented merely the prolonged execution of a single original intention.  It follows that the majority's equation of the two concepts is fundamentally unsound.

### B.  *Absence of Supporting Precedent*

The majority makes no attempt to demonstrate that *Bailey*'s impulse rule is in fact conceptually coextensive with the "common scheme or plan" rubric of section 12022.6.  Instead it suggests that case law interpreting *Bailey* has so clearly equated (or conflated) the two concepts that defendant " 'could not have foreseen' " his exposure to multiple theft convictions " 'at the time of the alleged criminal conduct.' "  (Maj. opn., *ante*, at p. 11, quoting *People v. Blakeley* (2000) 23 Cal.4th 82, 91.)  This assertion cannot survive scrutiny.

No case applying an impulse rule, before or after *Bailey*, has so much as suggested that multiple thefts must be collapsed into a single charge merely because they reflect a "common scheme or plan."  The majority alludes to a "long, uninterrupted series of Court of Appeal cases . . . that have consistently held that multiple acts of grand theft pursuant to a *single scheme* cannot support more than one count of grand theft."  (Maj. opn., *ante*, at p. 11, italics added.)  In doing so, the majority explicitly conflates "*single* scheme" with "*common* scheme."  Properly understood, the former refers to a *solitary* criminal *intention*, while the latter refers to a methodology or other *outward* characteristics *shared by multiple separate offenses*.

The majority identifies two decisions as exemplifying the line of cases said to warrant a belief by defendant that he could only be convicted of one theft.  (Maj. opn., *ante*, at p. 11.)  In *People v. Sullivan* (1978) 80 Cal.App.3d 16 (*Sullivan*), the question was whether the trial court erred by *refusing a requested instruction* that a " '[s]eries of wrongful acts may constitute a single offense' " when they are " 'committed pursuant to

17

one general intent or impulse and one plan.' " (*Id.* at p. 19.) As in *Bailey* itself, neither the word "common" nor the word "scheme" is anywhere to be found. The defendants in *Sullivan* had prevailed upon their landlords to let them appropriate a $14,000 payment the latter had received from the sale of a house. The prosecutor predicated separate counts on several subsidiary transfers and payments by which the funds were appropriated. These facts would support an instruction under any interpretation of *Bailey*, and the trial court had clearly erred by refusing to give one. At the same time, it is doubtful that the facts showed a "common scheme or plan," as that phrase has been understood. The defendants apparently took the victims' funds in several different forms, including cash, direct deposits, and cashier's checks negotiated at various times. (See *Sullivan*, *supra*, at p. 18.) Nothing in the court's account suggests a *recurring* plan or strategy; instead it shows a single preconceived plot to appropriate the targeted funds. Thus nothing in the opinion would justify a belief by someone in defendant's position that separate, repetitive, opportunistic takings would not sustain multiple convictions.

The second case the majority cites in support of such a belief is *Kronemyer*, *supra*, 189 Cal.App.3d 314. As previously noted, that case is relevant here with respect to the court's holding that the defendant attorney's theft of funds from four savings accounts in four days could not sustain four separate counts. The court held that, on the record before it, this conduct constituted a single offense. It apparently did not view the question as one for the jury, as it ordinarily would be, because the prosecutor's "theory of the case at trial" had been that the defendant "formed his intent to steal the assets of [his client's] estate" before the client fell ill, and that "the plan included unlawfully taking all the savings accounts assets." (*Id.* at p. 364.) This argument brought the case squarely within the "single plan-single offense rule" laid down in *Bailey* and elsewhere. (*Kronemyer*, at p. 364.) This conclusion was not altered by "[t]he fact these physically separated funds required four transactions." (*Ibid.*) Nothing in the case suggests that the mere repetitive

18

use of a mode of operation, or any other similarity, would have required aggregation; indeed, while the court set aside multiple embezzlement counts for instructional error, it never suggested that those counts—similar as the underlying conduct might be—came within the rule of *Bailey*. (See *id.* at pp. 355-362.)

In sum, no precedent sustains the majority's equation of *Bailey*'s impulse rule with section 12022.6(b)'s "common plan or scheme."

### III. *Application Here*

The jury was certainly justified in concluding that defendant's repetitive use of fictitious purchase transactions constituted a "common scheme or plan" warranting the aggregation of his offenses for purposes of a high-value sentence enhancement under section 12022.6(b). But nothing before this court compels the conclusion that defendant's 20 thefts from his employer constituted a single impulse under *Bailey* or cases following it. We are directed to no evidence of a single originating impulse or intention, or ulterior motive, or of the targeting of any particular body of property, by defendant. Rather his conduct can readily be seen as a series of opportunistic thefts employing a modus operandi to which he repeatedly resorted simply because it worked. Such cases do not qualify, and never have qualified, for prosecution as a single offense under the single-impulse rule. Again, the essential idea behind that rule is that one who decides to steal particular property should not be subject to multiple prosecutions—and should not be able to avoid prosecution based on the full value of the property—merely because multiple acts are required to carry out the intended crime. A defendant who simply engages in a series of similar thefts—a "serial thief," as the majority puts it— stands in a quite different position. (Maj. opn., *ante*, at p. 10.) Such a thief's conduct is not defined by any limitation of time, or of identity or quantity of property to be stolen. The thief simply finds himself in a situation presenting a recurring opportunity to unlawfully acquire property from the victim—an opportunity which the thief exploits as

19

often as he is able and inclined to do so. The fact that such takings may follow a characteristic pattern—a "common scheme or plan"—has never been a reason to treat them as something other than multiple, separate thefts.

This view finds ample support in cases applying *Bailey*. In *People v. Mitchell*, *supra*, 164 Cal.App.4th 442, the defendant committed a large number of crimes against the dependent adult for whom she was a caretaker. One of the claims on appeal was that she could not be convicted of two violations of unlawful use of personal identifying information (Pen. Code, § 530.5, subd. (a)) based upon her use of the victim's driver's license to make purchases at two different stores. The court rejected this contention: "In deciding whether a defendant commits a series of thefts pursuant to a single intent or plan, we do not use a single, broad objective of stealing property. A defendant who steals from multiple victims over a lengthy crime spree may have a single objective of obtaining as much money or property as possible. However, he has still committed multiple offenses." (*Mitchell*, *supra*, at p. 456.) I agree, and I do not believe this principle is limited to cases involving multiple victims, but extends to cases where the defendant commits a series of separately intended thefts against the same victim.

Other cases have also implicitly rejected the sweeping rule attributed by the majority to current case law. (Maj. opn., *ante*, at p. 11.) In *People v. Jaska* (201) 194 Cal.App.4th 971 (*Jaska*), the defendant contended that *Bailey* required the court to set aside four of her five convictions of grand theft by embezzlement. The counts were predicated on five thematically grouped clusters of misappropriations from the employer-victim.[12] The defendant argued that all of her conduct should have been aggregated into

---

[12] As in many of these cases, neither party's interests were precisely aligned with a fastidious application of *Bailey*'s impulse rule. The evidence showed a very large number of misappropriations exceeding the grand theft threshold. (*Jaska*, *supra*, 194 Cal.App.4th at pp. 976-979.) Their aggregation into five thematically oriented counts

*(footnote continued on next page)*

a single charge.  After reviewing *Bailey* and other cases in some depth, the court adopted a factor-based analysis hinging application of *Bailey* on some combination of (1) a "plot or scheme" (*id.* at p. 984); (2) "a defined sum of money or particular items of property" (*ibid.*); (3) commission within a "short timespan" (*id.* at p. 985, citing *People v. Gardner* (1979) 90 Cal.App.3d 42, 48); (4) commission in the same or "similar location," (*Jaska,* at p. 985, citing *In re Arthur V.* (2008)166 Cal.App.4th 61, 69); and (5) "perhaps most significantly, whether the defendant employed a single method to commit the thefts" (*Jaska,* at p. 985, citing *People v. Packard* (1981) 131 Cal.App.3d 622, 625).  While I question this approach in some respects, I wholeheartedly agree with the court's conclusion that there was no basis to conclude that the defendant there had "acted pursuant to a plan or scheme to steal a defined set of BTP's assets," or had otherwise brought her conduct within the rule of *Bailey*.  (*Jaska, supra,* at p. 985.)  "Rather, the evidence suggest[ed] that [she had] stole[n] various sums of money in an opportunistic manner, essentially whenever the need and/or occasion arose."  (*Ibid*.)

The only substantial distinction between *Jaska* and the present case is defendant's use here of a distinctive modus operandi to perpetrate his serial thefts—a factor which the court found missing in *Jaska*, and which I think it emphasized excessively.  The repeated use of a distinctive modus operandi may well *support an inference* that a series of takings arose from a single originating impulse, but it can hardly compel such an inference.  Indeed I doubt that, as an abstract matter, it is the "most significant[]" factor, as suggested in *Jaska*, *supra*, 194 Cal.App.4th at page 985.  A defendant who hits upon a

_____

*(footnote continued from previous page)*
was probably a matter of prosecutorial convenience or necessity.  The defendant lacked any incentive to challenge those aggregations, since the alternative might have been dozens of grand theft charges based upon separate transactions.

novel way to steal merchandise from a jewelry store may well resort to that method repeatedly; neither logic nor policy—nor anything in *Bailey* or cases applying it—makes it any more appropriate to aggregate such takings than it would be if the same defendant repeatedly stole from the same store using a variety of methods. In contrast, a defendant who decides to steal the Encyclopedia Brittanica from a library comes within the rule of *Bailey* even if it takes 20 trips—and 20 different methods—to collect the entire set. Such a defendant differs critically from one who simply steals a book, or a necklace, "whenever the need and/or occasion [arises]." (*Jaska*, *supra*, at p. 985.) The latter cannot legitimately invoke the rule of *Bailey*, even if each theft is accomplished by exactly the same means.

In sum, without the crucial element of a unifying impulse or intent, a series of opportunistic takings cannot be viewed as a single crime, however similar they may be. The record does not compel a conclusion that defendant's conduct was anything other than such a series of opportunistic thefts. He gave the jury no particular reason to find that he acted pursuant to a single impulse. There was no testimony that he set out to steal 20 motorcycles, or motorcycles of a specified value, or for a specified time. All that appears of relevance to this issue is that he submitted 20 false invoices, for 20 different vehicles, in 20 distinct transactions, on 20 separate occasions. It is true that on some occasions, multiple transactions took place on the same day. Close proximity in time will certainly add weight to an inference that multiple takings arose from a single impulse. Indeed a jury would be competent to find that all 20 takings here were so joined. The point here is that nothing in this record *compels* a conclusion that they were so joined *as a matter of law*.

As the court declared in *Jaska*, *supra*, 194 Cal.App.4th at page 984, "The *Bailey* doctrine applies as a matter of law only in the absence of any evidence from which the jury could have reasonably inferred that the defendant acted pursuant to more than one

intention, one general impulse, or one plan." Defendant has made no attempt to show that the evidence was insufficient in this regard. His entire argument rests on the premise that the jury's finding of a "common scheme or plan" *precluded* multiple convictions. Since that premise finds no support in existing law, reversal is unwarranted.

## IV. *"Felony Discount"*

The majority criticizes the impulse rule and, on that basis, may be understood to repudiate that rule in the case of multiple takings each of which involves property of sufficient value to sustain a conviction for grand theft.[13] The criticism is that, when such takings are aggregated under the *Bailey* rule, the defendant receives a " ' "felony discount." ' " (Maj. opn., *ante*, at pp. 7, 10, quoting Court of Appeal.) So far as I can

_____

[13] Justice Liu and I appear to read the majority opinion differently in this regard. In what appears to be the crucial passage concerning the fate of *Bailey*, the majority opinion states, "We thus have cases distinguished but not overruled in *Bailey*, *supra*, 55 Cal.2d 514, that support multiple convictions of grand theft in this case, post-*Bailey* Court of Appeal cases relying on *Bailey* that would prohibit such multiple convictions, and *Bailey* itself. We must decide what the proper rule should be. We need not decide whether the *Bailey* rule regarding a series of *petty* thefts applies similarly to a series of *grand* thefts. As *Bailey*'s discussion of earlier cases upholding multiple convictions of grand theft implies, *Bailey* is factually distinguishable. The *Bailey* rule must be interpreted in light of its facts." (Maj. opn., *ante*, at p. 8.) Justice Liu is apparently referring to this passage when he writes that the majority "merely assumes, without deciding, that the *Bailey* rule applies here." (Conc. opn., *ante*, at p. 1.) In my view, however, the passage invites the interpretation that *Bailey* has ceased to have any effect, except as it may continue to permit the aggregation of larcenous acts that would otherwise constitute *petty* theft—a distinction I join Justice Liu in finding insupportable. (See pt. V, *post*.) As previously noted, that Justice Liu and I do not extract the same meaning from this seemingly pivotal passage testifies to the doubt and confusion the opinion is destined to sow in the lower courts. In this it ironically mimics *Bailey* itself, which in my view expressed in a comparably oblique manner the intention to abrogate the very cases the majority now seems to resuscitate. Had the court then foreseen this resurrection, I suspect it would have taken greater pains to drive a stake through the heart of those cases. Instead it left them free to rise again to haunt the lower courts, as has now apparently occurred.

determine, this is a mere catchphrase, devoid of substantive content. If it contains any neutral meaning, it is simply that treating a course of conduct as a single crime exposes the defendant to a lower maximum punishment than could be imposed if the same conduct were treated as many crimes. This is akin to pointing out that "one is fewer than many," which I believe goes without saying.[14] To present such an empty truism as a ground for setting aside or eroding 95 years of precedent strikes me as unlikely to advance the rational evolution of the law.

The "felony discount" criticism seizes upon one aspect of a defendant's culpability—the number of appropriative acts committed—and declares it sufficient to justify overturning solidly established precedent. It is of course true in the abstract that, *all other things being equal*, one who engages in wrongful conduct on multiple occasions, or for a longer time, is more blameworthy, and thus may deserve greater punishment, than one who engages in similar conduct only once or briefly. But all other things are never equal, and the number of wrongful acts is only one of many variables that must go into the determination of a just punishment. The analytical shortcomings of the majority's suppositions may be exposed simply by comparing a case where a defendant fraudulently collects 12 monthly benefit payments of $951 a month to one where, after long and deliberate insinuation into an elderly victim's good graces, the defendant absconds with her $250,000 life savings. Under the majority's reasoning we must avoid allowing a "felony discount" by permitting the first defendant to be charged with 12 felonies—carrying a maximum sentence, by my calculations, of some 10 years and four months. (See Pen. Code, §§ 489, subd. (c), 1170, subd. (h)(1), 1170.1, subd. (a).) But the defendant in the second case is subject to a sentence of only five years,

---

[14] Even among lawyers. (See generally Milot, *Illuminating Innumeracy* (2013) 63 Case West. Res. L.Rev. 769.)

24

*including* a two-year enhancement based upon the size of the taking. (Pen. Code, §§ 489, subd. (c), 1170, subd. (h)(1), 12022.6, subd. (a)(2).) Has he then received a volume discount?

Only the most myopic moral calculus can declare it categorically more blameworthy to inflict a dozen pinpricks than a single knife wound.

## V. *Large vs. Small Takings*

Finally I agree with Justice Liu that in the absence of legislative authorization, there can be no justification for varying the unit of prosecution in theft cases according to the value of the property taken. The majority appears to reserve the possibility that while a strictly acts-based approach will henceforth apply to takings large enough to support multiple grand theft charges, a *Bailey*-like rule may continue to operate to combine multiple takings that would constitute petty thefts if not aggregated into a single grand theft charge.[15] This is an insupportable qualification whose mischief, I fear, will promptly be felt in the lower courts.

The unit of prosecution for a given offense is part of the *definition* of the offense. (See *In re Carleisha P.*, *supra*, 144 Cal.App.4th 912, 919-923.)[16] That definition

---

[15] Justice Chin writes: "We need not decide whether the *Bailey* rule regarding a series of *petty* thefts applies similarly to a series of *grand* thefts." (Maj. opn., *ante*, at p. 8.) "As the Court of Appeal put it, a serial thief should not receive a 'felony discount' if the thefts are separate and distinct even if they are similar. Accordingly, we conclude that a defendant may be convicted of multiple counts of *grand* theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 10, italics added.)

[16] Although I have found no California decision acknowledging this point in these exact terms, it has certainly been recognized in many other states, whose courts declare the legislative definition of a crime to be the guiding star in ascertaining its unit of prosecution. (See, e.g., *People v. Herron* (Colo. Ct. App. 2010) 251 P.3d 1190, 1193 ["proper inquiry" is whether legislature's "definition of the crime charged encompasses a continuous course of conduct"]; *State v. Velez* (Iowa 2013) 829 N.W.2d 572, 579 ["key

*(footnote continued on next page)*

necessarily includes, or must be construed to include, criteria for determining when a course of criminal conduct is divisible into multiple offenses, and when it will support only a single charge.  (*In re Carleisha P.*, *supra*, 144 Cal.App.4th at pp. 919-923.)  As this court has repeatedly said, the power to define crimes and prescribe punishments for them is vested exclusively in the Legislature.  (*People v. Farley* (2009) 46 Cal.4th 1053, 1119 [" ' " 'the power to define crimes and fix penalties is vested exclusively in the legislative branch' " ' "]; accord, *People v. Chun* (2009) 45 Cal.4th 1172, 1183; *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631; *In re Brown* (1973) 9 Cal.3d 612, 624 ["In California all crimes are statutory and there are no common law crimes. Only the Legislature and not the courts may make conduct criminal."]; see Pen. Code, §§ 6 ["No act or omission . . . is criminal or punishable, except as prescribed or authorized by this Code . . . ."], 15 ["A crime . . . is an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed . . . [one] of the following punishments . . . ."].)

---

*(footnote continued from previous page)*
question" in determining whether defendant properly convicted of two offenses "is legislative intent"]; *State v. Haymond* (Kan.Ct.App. 2011) 263 P.3d 222 ['t]he unit of prosecution test is a test of statutory interpretation"] [nonpub. opn.]; *Moore v. State* (Md. Ct. Spec. App. 2011) 198 Md.App. 655, 680 [18 A.3d 981, 995] ["The key to the determination of the unit of prosecution is legislative intent."]; *State v. Olsson* (N.M. Ct. App. 2007) 143 N.M. 351, 354-356 [176 P.3d 340, 343-345].)

Federal jurisprudence is to the same effect:  "Determining a statute's unit of prosecution requires ascertaining Congress's intent, which in turn requires statutory construction.  Such an inquiry is specific to each statute and to the facts of the case. . . . If the intended unit of prosecution is still unclear after applying these various canons of construction, then courts generally apply the rule of lenity to resolve the ambiguity in favor of the defendant."  (Comment, *How Many Is "Any"?:  Interpreting § 2252a's Unit of Prosecution for Child Pornography Possession* (2013) 62 Amer.U. L.Rev. 1675, 1693; fns. omitted.)

26

For the most part the Penal Code defines theft without regard to whether a particular taking involves property of sufficient value to sustain a grand theft charge. "The distinctions between grand and petty theft according to the Penal Code are in the type of article stolen, whether the article was taken from the person of another and in the value thereof.  Pen.Code, §§ 484, 487, 487a, 488.  *The elements of the crime remain the same* with the exceptions noted."  (*Gomez v. Superior* (1958) 50 Cal.2d 640, 645, italics added; see *People v. Cuellar* (2008) 165 Cal.App.4th 833, 837 ["petty theft is merely theft that does not qualify as grand theft"].)

As previously noted, the California Legislature has in a few narrowly defined situations provided special time-based unit of prosecution rules allowing the aggregation of what would otherwise constitute a series of petty thefts into one grand theft.  (See fn. 2, *ante*.)  But these exceptions to the generally uniform definition of theft merely illustrate the Legislature's ability to adopt special unit of prosecution rules for particular situations when it perceives a need to do so.  Here the majority seems to be reserving the possibility of exercising this quintessentially legislative power by adopting distinctions between the definition of petty theft and grand theft which have no basis in statute.  There can be no justification for a *judicial* definition of theft, or any other crime, that varies the defining characteristics of the crime from case to case.

Further, I am troubled by the nature of the disparate treatment apparently contemplated.  The majority's criticism of an impulse rule in the context of larger takings rests explicitly on the perception that combining such takings in a single charge may expose the defendant to a lesser punishment than he or she deserves; hence the repeated allusion to a " ' "felony discount." ' "  (Maj. opn., *ante*, at pp. 7, 10.)  The reservation of a different rule for smaller takings apparently rests on the supposition that treating them consistently with the foregoing, by requiring their prosecution as multiple petty thefts rather than a single aggregated grand theft, would expose defendants in that situation to a

27

lesser punishment than *they* deserve. In both cases, then, the majority seems to posit a unit of prosecution so formulated as to expose the defendant to the most onerous punishment.

However, once the unit of prosecution is understood to be defined by statute—subject only to judicial interpretation—the construction to be adopted, in the absence of legislative guidance, must be the one *favoring the defendant*. This follows from the rule of lenity, which applies as much to unit of prosecution issues as to any other issue of the meaning of a penal statute. (See *In re Carleisha P.*, *supra*, 144 Cal.App.4th at p. 923 [where the "proper unit of prosecution" under governing statute was "ambiguous," court applied rule of lenity to conclude that possession of three types of ammunition constituted only one offense].)**17** This approach " ' "protects the individual against

_____

**17** Cases in many other jurisdictions have held the rule of lenity applicable to unit of prosecution issues. (See *Bell v. United States* (1955) 349 U.S. 81, 83 ["When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will [with respect to the unit of prosecution], the ambiguity should be resolved in favor of lenity."]; *U.S. v. Emly* (8th Cir. 2014) 747 F.3d 974, 977; *U.S. v. Lagrone* (5th Cir. 2014) 743 F.3d 122, 126; *U.S. v. Shrader* (4th Cir. 2012) 675 F.3d 300, 313; *U.S. v. Diaz* (3d Cir. 2010) 592 F.3d 467, 474; *U.S. v. Finley* (2d Cir. 2001) 245 F.3d 199, 207; *U.S. v. Verrecchia* (1st Cir. 1999) 196 F.3d 294, 297; *U.S. v. Wilson* (D.C. Cir. 1998) 160 F.3d 732, 749; *U.S. v. Keen* (9th Cir. 1996) 104 F.3d 1111, 1119; *U.S. v. Song* (7th Cir. 1991) 934 F.2d 105, 108; *U.S. v. Mastrangelo* (11th Cir. 1984) 733 F.2d 793, 801; *U.S. v. Valentine* (10th Cir. 1983) 706 F.2d 282, 293;*U.S. v. Rosenbarger* (6th Cir. 1976) 536 F.2d 715, 721; *Townsend v. State* (Ala. Crim. App. 2001) 823 So.2d 717, 723; *People v. Lowe* (Colo. 1983) 660 P.2d 1261, 1269, overruled on other grounds in *Callis v. People* (Colo. 1984) 692 P.2d 1045, 1050, fn. 7; *State v. Rawls* (1985) 198 Conn. 111, 122 [502 A.2d 374, 379]; *Neal v. State* (Fla. App. 2013) 109 So.3d 1245, 1250; *State v. Auwae* (App. 1998) 89 Hawai'i 59, 70 [968 P.2d 1070, 1081], overruled on other grounds in *State v. Jenkins* (2000) 93 Hawai'i 87 [997 P.2d 13], and cited with approval in *State v. Shimabukuro* (2002) 100 Hawai'i 324, 327 [60 P.3d 274, 277]; *People v. Manning* (1978) 71 Ill.2d 132, 137 [374 N.E.2d 200, 202]; *State v. Muhlenbruch* (Iowa 2007) 728 N.W.2d 212, 216; *State v. King* (2013) 297 Kan. 955, 971 [305 P.3d 641, 654]; *Miles v. State* (1998) 349 Md. 215, 227-228 [707 A.2d 841, 847]; *Commonwealth v. Rabb* (2000) 431 Mass. 123, 128 [725 N.E.2d 1036, 1041]; *People v. Haggart* (1985) 142 Mich.App. 330,

*(footnote continued on next page)*

28

arbitrary discretion by officials and judges and guards against judicial usurpation of the legislative function which would result from enforcement of penalties when the legislative branch did not clearly prescribe them." ' " (*In re Carleisha P.*, *supra*, 144 Cal.App.4th at p. 923, quoting *People v. Robles* (2000) 23 Cal.4th 1106, 1115.)

This court is no stranger to the rule of lenity. (See *People v. Arias* (2008) 45 Cal.4th 169, 177 (maj. opn. of Chin, J.) ["If a statute defining a crime or punishment is susceptible of two reasonable interpretations, we ordinarily adopt the interpretation that is more favorable to the defendant."]; *Smith v. Superior Court* (2006) 39 Cal.4th 77, 92 (Baxter, J., expressing the unanimous view of the court) ["The rule of strict construction of penal statutes 'has generally been applied in this state to criminal statutes, rather than statutes which prescribe only civil monetary penalties.' " (quoting *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 312)]; *People v. Canty* (2004) 32 Cal.4th 1266, 1277 (George, C.J., expressing the unanimous view of the court) ["under the traditional 'rule of lenity,' language in a penal statute that truly is susceptible of more than one reasonable construction in meaning or application ordinarily is construed in the manner that is more

---

*(footnote continued from previous page)*
348 [370 N.W.2d 345, 354]; *State v. Liberty* (Mo. 2012) 370 S.W.3d 537, 553; *State v. Jennings* (2007) 155 N.H. 768, 777 [929 A.2d 982, 990]; *State v. Tillem* (N.J. Super. Ct. App. Div. 1974) 127 N.J.Super. 421, 429 [317 A.2d 738, 743]; *State v. Olsson* (N.M. 2014) 324 P.3d 1230, 1239; *State v. Wiggins* (N.C. App. 2011) 210 N.C.App. 128, 133 [707 S.E.2d 664, 669], [" '[t]he rule of lenity 'forbids a court to interpret a statute so as to increase the penalty that it places on an individual when the Legislature has not clearly stated such an intention.' "]; *State v. Watkins* (Tenn. 2012) 362 S.W.3d 530, 543 ["any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution"]; *Acey v. Commonwealth* (1999) 29 Va.App. 240, 250-251 [511 S.E.2d 429, 433-434]; *State v. Sutherby* (2009) 165 Wash.2d 870, 878-879 [204 P.3d 916, 920]; *State v. Goins* (2013) 231 W.Va. 617, 623 [748 S.E.2d 813, 819]; *Amrein v. State* (Wyo. 1992) 836 P.2d 862, 865.)

favorable to the defendant"]; *People v. Smith* (2004) 32 Cal.4th 792, 798 (Kennard, J., expressing the unanimous view of the court); *People v. Avery* (2002) 27 Cal.4th 49, 58 (Chin, J., expressing the unanimous view of the court) ["true ambiguities are resolved in a defendant's favor"]; *People v. Garcia* (1999) 21 Cal.4th 1, 10 (maj. opn. of Werdegar, J.); *People v. Franklin* (1999) 20 Cal.4th 249, 253 (maj. opn. of Chin, J.) [registration statute "must be construed as favorably to the defendant as its language and the circumstances of its application reasonably may permit"]; see *People v. Kroncke* (1999) 70 Cal.App.4th 1535, 1558 (conc. & dis. opn. of Corrigan, P.J.) ["If the language is ambiguous, standard rules of construction require that a statute imposing penal consequences be narrowly construed."].)

Admittedly, this court has recently inclined toward a relatively narrow view of the rule of lenity, sometimes declaring that it applies only where " ' "the court can do no more than guess what the legislative body intended," ' " and where " ' "an egregious ambiguity and uncertainty" ' " appears. (*People v. Canty*, *supra*, 32 Cal.4th at p. 1277.) But it is difficult to picture a situation where legislative intent is harder to discern than in the determination of units of prosecution in cases of multiple misappropriative acts effecting a single original intent to steal. The situation seems precisely the one described by the United States Supreme Court in *Bell v. United States*, *supra*, 349 U.S. at p. 83: The Legislature has left "to the Judiciary the task of imputing to [it] an undeclared will." That being so, one would expect the rule of lenity to come into full play. Instead the majority turns the rule upside down by insisting that doubts as to the unit of prosecution will be resolved against the defendant in the case of larger takings, while leaving open the possibility that they may *also* be resolved against the defendant in the case of smaller takings.

In my view the difficulties presented by these cases are not an occasion to introduce radical new methods for resolving vexing issues of law but quite the reverse.

30

They demand a resort to neutral principles, consulting the statutory language in the first instance and resolving ambiguities in a manner consistent with relevant interpretive principles as well as the court's duty to formulate a rational, coherent, and administrable system of rules. I recognize that a number of other courts, including the Court of Appeal here, seem to assume an analytical distinction between large takings and small ones, but I wholeheartedly agree with the contrary view implicitly taken in *Bailey*, *supra*, 55 Cal. 2d at pages 518-519, but expressed there with a regrettable lack of forthrightness: that in the absence of a legislative directive to the contrary, any rule unifying multiple takings into a single theft must necessarily operate independently of the size of the takings, and must be applied neutrally, regardless of which party benefits in a particular case or class of cases.

*Conclusion*

I would hold that the rule of *Bailey* is fundamentally sound and should continue to govern units of prosecution in theft in this state. I would clarify, however, that it does not apply to a series of opportunistic takings joined only by a common modus operandi. Because I do not believe existing law warranted a conclusion to the contrary, and because the record does not establish that defendant is entitled to the protection of the rule as a matter of law, I would affirm the judgment.


**RUSHING, J.** [*]


---

[*] Administrative Presiding Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Whitmer

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 213 Cal.App.4th 122
**Rehearing Granted**


_____

**Opinion No.** S208843
**Date Filed:** July 24, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Candace J. Beason


_____

**Counsel:**

Eric R. Larson, under appointment by the Supreme Court, and Jolene Larimore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, Michael C. Keller and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric R. Larson
330 J Street, #609
San Diego, CA 92101
(619) 238-5575

Noah P. Hill
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-8884